ISMAIL J. RAMSEY (CABN 189820)
United States Attorney

THOMAS A. COLTHURST (CABN 99493)
Chief, Criminal Division

CASEY BOOME (NYBN 5101845)
Assistant United States Attorney

    450 Golden Gate Avenue, Box 36055
    San Francisco, California 94102-3495
    Telephone: (415) 436-7200
    FAX: (415) 436-7234
    Email: casey.boome@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>   Plaintiff,<br><br>  v.<br><br>RODRIGO SANTOS,<br><br>   Defendant. | CASE NOS.  CR 21-268-SI<br>                 CR 21-453-SI<br>                 CR 22-345-SI<br><br>**UNITED STATES' SENTENCING MEMORANDUM**<br><br>Date: August 25, 2023<br>Time: 11:30 a.m.<br><br>Hon. Susan Illston |

## TABLE OF CONTENTS

I. INTRODUCTION ...................................................................................................................1

II. OFFENSE CONDUCT ...........................................................................................................2

    A. Background on the Defendant and his Business ........................................................2

    B. The Bank Fraud Scheme .............................................................................................2

    C. Falsification of Records to Conceal the Bank Fraud Scheme ....................................3

    D. Tax Evasion ................................................................................................................3

    E. Honest Services Wire Fraud .......................................................................................3

III. APPLICABLE GUIDELINES RANGE ..................................................................................4

IV. FINANCIAL DISCLOSURES ................................................................................................5

V. SENTENCING RECOMMENDATION .................................................................................5

    A. Legal Standard ............................................................................................................5

    B. Discussion ...................................................................................................................6

VI. RESTITUTION ........................................................................................................................8

    A. The Plea Agreement ...................................................................................................8

    B. Hearing Set for DBI's Restitution Request – September 8, 2023 ...............................9

    C. DBI's Restitution Request ..........................................................................................9

    D. Analysis of DBI's Request ........................................................................................11

VII. FORFEITURE ........................................................................................................................14

VIII. CONCLUSION .......................................................................................................................15

# TABLE OF AUTHORITIES

**Cases**

*Hughey v. United States,*
    495 U.S. 411 (1990)..................................................................................................... 11

*Kelly v. United States*,
    140 S. Ct. 1565 (2020).................................................................................................. 12

*Pasquantino v. United States*,
    544 U.S. 349 (2005)...................................................................................................... 12

*United States v. Anderson,*
    741 F.3d 938 (9th Cir. 2013) ........................................................................................ 11

*United States v. Brock-Davis*,
    504 F.3d 991 (9th Cir. 2007) ........................................................................................ 12

*United States v. Carty*,
    520 F.3d 984 (9th Cir. 2008) .......................................................................................... 5

*United States v. Cummings*,
    281 F.3d 1046 (9th Cir, 2002) ...................................................................................... 11

*United States v. Davis*,
    706 F.3d 1081 (9th Cir. 2013) ...................................................................................... 14

*United States v. De La Fuente*,
    353 F.3d 766 (9th Cir.2003) ......................................................................................... 12

*United States v. Gordon*,
    393 F.3d 1044 (9th Cir.2004) ....................................................................................... 12

*United States v. Grice*,
    319 F.3d 1174 (9th Cir.2003) ....................................................................................... 12

*United States v. Hunter*,
    618 F.3d 1062 (9th Cir. 2010) ...................................................................................... 14

*United States v. Luis*,
    765 F.3d 1061 (9th Cir. 2014) ...................................................................................... 11

*United States v. Newman*,
    659 F.3d 1235 (9th Cir. 2011) ...................................................................................... 14

*United States v. Phillips*,
    367 F.3d 846 (9th Cir. 2004) ............................................................................. 11, 12, 13

*United States v. Rivera*,
    686 F. App'x. 470 (9th Cir. 2017) ................................................................................ 14

*United States v. Salcedo-Lopez*,
  907 F.2d 97 (9th Cir. 1990) .................................................................................................. 12

*United States v. Schurman*,
  No. 21-CR-00234-VC-1, 2022 WL 5337746 (N.D. Cal. 2022) ............................................ 11, 13

*United States v. Spano*,
  411 F.Supp.2d 923 (N.D. Ill. 2006) ..................................................................................... 8, 10

**Statutes**

18 U.S.C. § 982(b)(1) .................................................................................................................. 14

18 U.S.C. § 3553(a) ................................................................................................................... 5, 6

18 U.S.C. § 3663A ....................................................................................................................... 11

18 U.S.C. §§ 3663(a)(2) .............................................................................................................. 11

**Rules**

U.S.S.G. § 4C1.1 ............................................................................................................................ 5

**Regulations**

28 C.F.R. § 9.8 ............................................................................................................................. 14

## I. INTRODUCTION

At first glance, Defendant Rodrigo Santos' life appeared to be an unqualified success story. He attended excellent schools and earned a coveted structural engineering degree from Stanford University. He settled down in San Francisco where he and his wife embraced the community and raised two successful children. The defendant co-founded a successful engineering company and received prestigious city government appointments and board memberships in recognition of his professional accomplishments.

At the same time, there was another side to Rodrigo Santos' story that he hid from the public. For nearly a decade, Santos concealed a scheme of lies and deceit through which he stole approximately $1,500,000 from his clients and business partner. Once the FBI began investigating Santos' crimes, he tried to coverup his misdeeds by fraudulently altering documents, which he submitted to the FBI and the U.S. Attorney's Office in response to a grand jury subpoena. Over approximately the same time period, Santos executed a separate scheme in which he used charitable donations to influence a Senior Building Inspector to give favorable treatment to his clients.

On August 25, 2018, Santos will appear before this Court for a sentencing hearing after his pleas of guilty to ten counts of Bank Fraud, one count of Falsification of Records in a Federal Investigation, five counts of Tax Evasion, and one count of Honest Services Wire Fraud. Through his pleas, Santos admitted that he defrauded his clients, his business partner, the IRS, and the citizens of San Francisco. Santos engaged in a pattern of criminal conduct that continued for years until a criminal investigation and a lawsuit filed by the San Francisco City Attorney exposed his fraud schemes and other professional misconduct.[1] Therefore, the government respectfully requests that this Court sentence the defendant to 51 months in prison, to be followed by three years of supervised release. Such a sentence would be sufficient but not greater than necessary to reflect the seriousness of the offense and deter others from committing similar offenses. Additionally, the Court should order Santos to pay restitution to his clients, his business partner, the IRS, and the San Francisco Department of Building Inspection ("DBI").

---

[1] In addition to the check fraud scheme to defraud clients, the City of San Francisco's civil complaint alleges that Santos facilitated and submitted forged and fraudulent special inspection reports to DBI in connection with construction and renovation projects. *See* DBI-VIS at 2; *San Francisco v. Santos & Urritia et.al.*, CGC-18-569923 (S.F. Sup. Ct.).

1

## II. OFFENSE CONDUCT

### A. Background on the Defendant and his Business

At the time that he committed the offenses to which he as pleaded guilty, the defendant was a prominent structural engineer in San Francisco and the principal and co-founder of Santos & Urrutia Structural Engineers, Inc. ("S&U"). (PSR ¶ 9.) Mayor Willie Brown appointed Santos to the San Francisco Building Inspection Commission (BIC) in 2000. (*Id.*) In 2004, Mayor Gavin Newson appointed Santos as BIC President. (*Id.*)

Santos' day-to-day work included providing engineering services to clients, typically homeowners or contractors. (PSR ¶¶ 9, 17.) In addition to his engineering work through S&U, Santos marketed himself as a "permit expediter" who could help his clients to navigate the complex process of obtaining building permits from DBI, the regulatory agency responsible for overseeing the enforcement of building codes for commercial and residential buildings in San Francisco. (*See* Crim. Complaint at ¶ 9, CR-21-453-SI, ECF No. 1 at ¶ 3, 9-12.)

### B. The Bank Fraud Scheme

#### 1. Santos stole more than $775,000 from approximately 200 clients.

From November of 2012 until March of 2019, Santos repeatedly asked his clients to give him checks payable to DBI, the Department of Public Works, other municipal agencies, private companies, or individuals. (PSR ¶ 10.) Santos falsely told his clients that the checks would be used to pay fees or other costs associated with their building and construction projects, but in truth, there were no such fees owed. (*Id.*) Santos fraudulently endorsed or altered the client checks and deposited them into his personal bank account. (*Id.*) In total, the defendant fraudulently deposited 445 checks from approximately 200 clients totaling $775,412.90. (PSR ¶¶ 11, 14.)

#### 2. Santos stole more than $719,000 from his company and business partner.

The defendant also stole money from his company and business partner by taking checks intended for S&U and depositing them into his personal account. (PSR ¶ 15.) In furtherance of this scheme, Santos requested checks from clients payable to S&U as compensation for work that Santos had completed on behalf of the company. (*Id.*) But rather than submit those checks to S&U, where they

would have been used for expenses, payroll, and partnership distributions, Santos kept the money for himself. From approximately November of 2012 until November 2018, the defendant deposited into his personal account 378 checks written "pay to the order of" S&U amounting to a $899,854.18. (*Id.*) Of that $899,854.18, approximately 20% ($179,970.84) would have been owed to Santos in the normal course of partnership distributions from S&U. (*Id.*) Therefore, the loss to S&U resulting from the scheme is $719,883.34. (*Id.*)

In total, Santos stole $1,495,296.24 from his clients and his company.

### C. Falsification of Records to Conceal the Bank Fraud Scheme

On March 2, 2020, two FBI special agents interviewed Santos and served him with a grand jury subpoena requesting S&U documents related to six specific client checks connected to the bank fraud scheme described above. (PSR ¶ 13.) In response, Santos falsified and altered the invoices to make it appear as though he had credited his clients for checks that he had deposited into his personal bank account. (*Id.*) After altering the invoices, Santos submitted them to the government through his attorney. (*Id.*) This brazen attempt to obstruct the FBI's investigation failed when FBI agents obtained the genuine invoices from Santos' clients. (*Id.*)

### D. Tax Evasion

Between 2012 and 2019, the defendant deposited 823 checks totaling approximately $1,675,267.08 into his personal account. (PSR ¶ 16.) Unsurprisingly, he did not report the criminal proceeds to the IRS. (*Id.*)

### E. Honest Services Wire Fraud

Separate from his bank fraud scheme, Santos deprived the citizens of San Francisco of the honest services of DBI Senior Building Inspector Bernard Curran. In his plea agreement, Santos admits that between 2017 and 2020, he asked several clients to make charitable contributions to the San Francisco Golden Gate Rugby Association ("SFGGR"), a non-profit organization connected to Curran. (Plea Agreement ¶ 2.) Santos used those donations influence Curran, securing favors for his clients. (PSR ¶ 19.) Santos typically informed Curran of the donation while asking Curran to take an official action for the donor-client's benefit. For example, one of Santos' clients owned a property located on the 900

3
GOV. SENTENCING MEMORANDUM
CR 21-268-SI; CR 21-453-SI; CR-22-345-SI

Block of South Van Ness Avenue. (Crim. Complaint ¶ 34.) On April 16, 2018, Santos and Curran exchanged the following text messages about the property:

> SANTOS (to CURRAN): Can we schedule a final for [the 900 block of] South Van Ness? Client has given me his SF GG Rugby contribution.
>
> CURRAN (to SANTOS): Let me check it this morning
>
> SANTOS (to CURRAN): Thank you Senior. I am five minutes away from the site.

(*Id.*)

In at least one instance, Santos' scheme to influence Curran resulted in a San Francisco apartment building operating without a fire safety system for several years. Santos references this property in his plea agreement:

> In exchange for the stream of donations flowing to SFGGR from my clients, CURRAN gave my clients favorable official treatment in his capacity as a senior DBI inspector. For instance, on the 1400 block of Church Street, CURRAN gave final approval for a permit that required the installation of fire safety sprinklers in an accessory dwelling unit even though my client had never installed the sprinklers. My client, the sponsor of the project on the 1400 block of Church Street, made a $500 SFGGR donation via check.

(Plea Agreement ¶ 2.) On July 30, 2021, after Santos' scheme to influence Curran had been exposed, DBI opened a complaint regarding the property on the 1400 block of Church Street. (Gov. Sent. Memo re Curran, CR 21-453-SI, ECF No. 70 at *11.) Pursuant to DBI's complaint, the San Francisco Fire Department inspected the property and confirmed that the accessory dwelling unit ("ADU"), which Santos' client had added to the building, did not have sprinklers or any fire safety systems. (*Id.*) This indicates that the ADU, which is on the ground floor of a multi-story building with four other residential units, went without fire safety systems for several years.

In total, Santos had 13 clients to write 14 checks totaling $9,600 to SFGGR, with one client writing two checks. (PSR ¶ 22.) Curran took at least one official action, including performing inspections and/or issuing a Certificate of Final Completion, for all 13 donor-clients. (*Id.*)

### III. APPLICABLE GUIDELINES RANGE

The government agrees with the Guidelines calculation set forth in the PSR, which determines

that the total offense level is 24. (PSR ¶¶ 32-59.) The defendant has no criminal history, resulting in a criminal history score of zero and placing him in Criminal History Category I. (PSR ¶¶ 63-64.) The applicable Guidelines range is therefore 51-63 months of incarceration. (PSR ¶ 95.)

The government notes an amendment approved by the United States Sentencing Commission, scheduled to take effect on November 1, 2023, which provides for a decrease of two levels from the offense level for defendants with a criminal history score of zero and whose offense did not involve specified aggravating factors. U.S.S.G. § 4C1.1 (effective November 1, 2023).[2] Santos meets the requirements of § 4C1.1 and would receive a two-level downward adjustment if sentenced after November 1, 2023. A two-level downward variance would equate to a total offense level of 22 and a sentencing range of 41-51 months.

## IV. FINANCIAL DISCLOSURES

The government is concerned that the defendant may have underreported his income to the Probation Office. During his presentence interview, Mr. Santos reported that since June 2020 he has been working "seven days per week and earns approximately $35,000 to $40,000 per month," noting that "his work is lucrative as there are very few qualified and licensed structural engineers." (PSR ¶¶ 68, 85.) On his Probation Form 48 financial disclosures, however, the defendant reported monthly gross income of just $10,000 per month. (PSR ¶ 89.) The PSR does not address this inconsistency.

## V. SENTENCING RECOMMENDATION

### A. Legal Standard

The Court should impose a sentence sufficient but not greater than necessary to reflect the seriousness of the offense, promote respect for the law, provide just punishment; to afford adequate deterrence; to protect the public; and to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment. *United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008); *see also* 18 U.S.C. § 3553(a). Under Section 3553(a), in arriving at the appropriate sentence for the defendant, the Court should consider these factors applicable to this case, among others:

(1) The nature and circumstances of the offense and the history and characteristics of the

---

[2] Text available at https://www.ussc.gov/sites/default/files/pdf/amendment-process/official-text-amendments/202305_Amendments.pdf (last accessed August 17, 2023).

5

defendant;

(2) The need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(3) The need for the sentence imposed to afford adequate deterrence to criminal conduct;

(4) The need for the sentence imposed to protect the public from further crimes of the defendant; and

(5) The need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.

**B.     Discussion**

The government respectfully submits that a sentence of 51 months of imprisonment is sufficient but not greater than necessary to achieve the goals of sentencing set forth in 18 U.S.C. § 3553(a) and appropriately balances the aggravating and mitigating factors presented by the offense conduct and the history and characteristics of the defendant.

### 1. The nature and circumstances of the offense and the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment.

The seriousness of the defendant's conduct is beyond dispute. Santos stole more than $775,000 from San Francisco homeowners and businesses over a period of nearly eight years between 2012 and 2019. Similarly, Santos stole approximately $720,000 from his business partner between 2012 and 2018. Each of the 823 checks that Santos fraudulently deposited into his personal account represents an individual act of dishonesty, deceit, and greed. Santos' client's trusted him to navigate the complicated process of construction and renovation in San Francisco. He touted his knowledge, experience, and connections as a benefit to his clients. Santos' clients trusted him and he exploited their trust by manipulating them to enrich himself.

Santos' scheme to influence Curran is equally serious because it undermines the public's faith in government institutions. By virtue of his position as a Senior Building Inspector at DBI, Curran was trusted to fairly and faithfully enforce the building code to ensure that construction and renovation projects were completed in a manner consistent with all applicable safety and quality standards. Santos

corrupted this process by exchanging charitable donations for favorable inspections and approvals from Curran. Because the scheme called into question the integrity of Santos' and Curran's work, DBI initiated an audit to examine the extent to which public safety may have been jeopardized. The DBI audit is a significant undertaking that would be unnecessary but for the defendant's conduct.

### 2. The history and characteristics of the defendant.

Probation justifies its recommendation of a significant downward variance to a sentence of 30 months in prison primarily by highlighting the defendant's professional accolades, generosity towards family and friends, and his apparent remorse. These factors, however, lose much of their mitigating force when considered in the context of the offense conduct.

First, Santos received accolades and prestigious appointments from the City of San Francisco, including his appointment by then Mayor Gavin Newsom to serve as President of the BIC, which manages DBI and oversees enforcement of the city's building codes.[3] Santos exploited the reputation and trustworthiness attendant to these honors when he asked hundreds of homeowners to write checks to city agencies for fees that never existed. Furthermore, Santos' scheme to influence Curran undermined the integrity of DBI, the agency that Santos managed while serving as President of the BIC.

Second, according to the PSR, Santos has generously funded higher education for family members and financially supports his brother who has special needs. The government urges the Court to remember, however, that Santos' generosity was substantially funded by a tax-free stream of criminal fraud proceeds to the tune of more than $1,600,000.

Finally, regarding remorse as a mitigating factor, the government hopes that the defendant's expressions of regret and contrition are genuine. His current remorsefulness is undermined, however, by the length of Santos' criminal schemes and the fact that they were only stopped by law enforcement intervention. Indeed, the crimes to which the defendant has pleaded guilty were not the result of a single moment of weakness followed quickly by remorse and restitution. On the contrary, Santos engaged in this conduct for nearly a decade before he was confronted by the FBI in March of 2020. Even then, the defendant did not immediately accept responsibility, but rather falsified documents and sought to avoid

---

[3] https://sf.gov/departments/building-inspection-commission (accessed August 18, 2023).

7
GOV. SENTENCING MEMORANDUM
CR 21-268-SI; CR 21-453-SI; CR-22-345-SI

responsibility by obstructing the FBI's investigation. Only after being caught stealing from his clients *and* caught lying to the FBI to cover it up did Santos find remorse and begin to repay his victims.

### 3. The need for the sentence imposed to afford adequate deterrence.

General deterrence is of particular importance in public corruption cases. Here, it is critical that the Court impose a sentence that will deter similar schemes to deprive the public of the honest services of public officials.

> We need not resign ourselves to the fact that corruption exists in government. Unlike some criminal justice issues, the crime of public corruption can be deterred by significant penalties that hold all offenders properly accountable. The only way to protect the public from the ongoing problem of public corruption and to promote respect for the rule of law is to impose strict penalties on all defendants who engage in such conduct. . .

*United States v. Spano*, 411 F.Supp.2d 923, 940 (N.D. Ill. 2006), *affirmed*, 477 F.3d 517 (7th Cir. 2006).

The government's recommended sentence represents a significant but appropriate punishment for the defendant's crimes. This Court's sentence can send a message that those convicted of public corruption offenses will face serious consequences commensurate with the damage that such crimes cause to the public's faith in government institutions.

## VI. RESTITUTION

### A. The Plea Agreement

The plea agreement requires Santos to "make a good faith effort to pay any fine, forfeiture, or restitution that [he is] ordered to pay." (Plea Agreement ¶ 9.) Santos has promised to pay at least $1,495,296.24 to the victims of his bank fraud scheme (*Id.*), and the Court should order him to do so. The government will provide the Court Clerk's Office with the names and contact information of the victims for disbursement of funds.

Santos further promises in his plea agreement to pay restitution to the IRS for taxes owed, plus interest and penalties. (*Id.*) The IRS recently prepared an analysis calculating the amount of outstanding tax, interest, and penalties for each tax year 2012 through 2019. According to the report, which the government provided to the defendant's attorney, Santos' debt to IRS is as follows as of the date of sentencing, August 25, 2023.

| TAX YEAR | ADDITIONAL TAX OWED | PENALTIES | INTEREST | TOTAL |
|---|---|---|---|---|
| 2012 | $5,034.00 | $3,775.50 | $4,537.03 | $13,346.53 |
| 2013 | $28,610.00 | $21,457.50 | $23,543.87 | $73,611.37 |
| 2014 | $59,450.00 | $44,587.50 | $44,402.36 | $148,439.86 |
| 2015 | $57,982.00 | $43,486.50 | $38,666.49 | $140,134.99 |
| 2016 | $108,983.00 | $81,737.25 | $62,363.97 | $253,084.22 |
| 2017 | $257,731.00 | $193,298.25 | $122,562.16 | $573,591.41 |
| 2018 | $41,540.00 | $31,155.00 | $14,915.93 | $87,610.93 |
| 2019 | $5,572.00 | $4,179.00 | $1,441.12 | $11,192.12 |
| **TOTAL** | **$564,902.00** | **$423,676.50** | **$312,432.93** | **$1,301,011.43** |

The Court should therefore order restitution to the IRS in the amount of $1,301,001.43.

### B. Hearing Set for DBI's Restitution Request – September 8, 2023

DBI seeks restitution to cover the cost of a quality control audit of projects in which Santos and/or Curran were directly involved. At the conclusion of co-defendant Curran's sentencing hearing, the Court found that DBI was a victim entitled to restitution and set a further hearing on September 8, 2023, to determine the amount of restitution owed. (*See* ECF No. 71.) Here, the Court should similarly find that Santos' scheme to influence Curran directly and proximately caused financial harm to DBI. Furthermore, the government respectfully requests that the Court convert Curran's September 8, 2023 hearing into a combined restitution hearing as to Curran and Santos.

### C. DBI's Restitution Request

In a victim impact statement submitted on behalf of DBI, Director O'Riordan explains why DBI initiated the audit after learning of Santos's criminal conduct:

> In August 2020, when DBI became aware of building code violations pertaining to permits, plans, and inspections involving Santos and Curran, DBI began its investigation. Given the severe risk to public safety posed by construction projects that had not received proper inspections and/or review by DBI due to Santos' misconduct (e.g. risks to San Francisco home owners and their neighbors), there was an urgent need for DBI to conduct an audit of all properties and/or projects involving Santos.

DBI-VIS at 2.

9

Director O'Riordan also described the methodology of the audit, which identified 5,445 properties and separated them into three tiers:

- **Tier 1**: 119 properties where both Santos and Curran were involved.
- **Tier 2**: 158 properties where either Santos and Curran was involved and the property sits in a steep slope or seismic hazard zone, indicating heightened risk for a life-safety hazard. Tier 2 includes 102 Santos-related properties and 56 Curran-related properties.
- **Tier 3**: 5,168 properties outside of a slope or seismic hazard zone where either Curran or Santos were involved. Tier 3 includes 2,320 Santos-related properties and 2,846 Curran-related properties.

*See* DBI-VIS at 2-3. As of July 24, 2023, the audit team had spent 4,645 hours reviewing 1,210 properties, which equates to slightly less than 3.9 hours per property. *See Id.* at 3. The audit team, which is comprised of DBI professional staff, has completed its review of all Tier 1 and Tier 2 properties, and some Tier 3 properties. *Id.* According to the statutory hourly rates codified in the San Francisco Building Code, the cost of 4,645 hours is $456,890 (approximately $98.36 per hour or $377.60 per property).[4] *Id.* Using the per-property cost of $377.60, the actual cost of the audit to date is as follows:

- **Tier 1**: $44,934.40 (completed, 119 properties)
- **Tier 2**: $49,433.46 (completed, 158 properties)
    - Santos-related Tier 2 properties (102): $38,515.20
    - Curran-related Tier 2 properties (56): $21,145.60
- **Tier 3**: $352,300.80 (933 of 5,168 properties reviewed)
    - Reviewed Santos-related Tier 3 properties (665 of 2,322): $251,104.00
    - Reviewed Curran-related Tier 3 properties (261 of 2,846): $98,553.60

---

[4] According to Direct O'Riordan's letter, DBI calculated the cost of its employee compensation by reference to the statutory hourly rates codified in SF Building Code section 110A, Table 1A-D and attached to Director O'Riordan's letter. The statute sets forth the required costs for plan review ($173.91/hour), inspection ($158.10/hour), and administration ($96.72/hour).

10

GOV. SENTENCING MEMORANDUM
CR 21-268-SI; CR 21-453-SI; CR-22-345-SI

*Id.* at 3. Therefore, to date, the actual audit costs attributable to Santos include $44,934.40 for Tier 1 properties (jointly and severally with Curran), plus $289,619.20 for properties in Tiers 2 and 3, resulting in a total of $334,553.60.

Moving forward, DBI estimates that audit costs will decrease to approximately $312.87 per property due to more streamlined audit procedures that DBI recently implemented. *See Id.* at 4 n. 2. There are 1,657 Santos-related Tier 3 properties pending review. The projected cost to review those properties is $518,425.59 at the streamlined rate of $312.87 per property. As such, the past and future audit costs associated with Santos total $852,979.19.

### D. Analysis of DBI's Request

The Mandatory Victims Restitution Act ("MVRA"), 18 U.S.C. § 3663A, requires the district court to "order a defendant to make restitution to a victim of certain specified offenses," *United States v. Anderson,* 741 F.3d 938, 951 (9th Cir. 2013) (citation omitted), including "offenses against property" under Title 18. The MVRA does not define what constitutes an "offense against property," but the Ninth Circuit has adopted a broad reading of the phrase to include all crimes that infringe a victim's property interest. *United States v. Schurman*, No. 21-CR-00234-VC-1, 2022 WL 5337746, at *1 (N.D. Cal. Oct. 7, 2022), citing *United States v. Luis*, 765 F.3d 1061, 1065 (9th Cir. 2014). Physical damage to property is not necessary so long as the victim suffers a pecuniary loss. *Luis,* 765 F.3d at 1065–66.

Restitution is authorized where a defendant's offense conduct causes an identifiable victim of the offense to suffer recoverable losses. *Hughey v. United States,* 495 U.S. 411, 416 (1990). The MVRA defines a "victim" as any "person directly and proximately harmed as a result of the commission of the offense for which restitution may be ordered." 18 U.S.C. §§ 3663(a)(2), 3663A(a)(2). Thus, restitution is required under the MVRA if the harm caused to the victim is the direct and proximate result of the defendant's conduct. The Ninth Circuit has applied this standard by asking "whether the [victim's] costs were incurred as a 'direct and foreseeable result' of the defendant's wrongful conduct." *United States v. Phillips*, 367 F.3d 846, 863 (9th Cir. 2004) (quoting *United States v. Cummings*, 281 F.3d 1046, 1052 (9th Cir. (2002)).

It is well established that a government agency may be considered a victim for purposes of

restitution. *United States v. Salcedo-Lopez*, 907 F.2d 97, 99 n.2 (9th Cir. 1990) (holding in a case decided under the VWPA[5] that "when the government loses money as the direct result of an offense, it is as entitled to restitution as any other victim of an offense"); *Schurman,* No. 21-CR-00234-VC-1 at *6 (awarding restitution to DBI for the cost of salaried employees re-inspecting properties affected by the defendant's fraud scheme); *Phillips*, 367 F.3d at 863–64 (holding in a case prosecuted under the Clean Water Act that the Environmental Protection Agency could recover site investigation costs to assess the environmental damage caused by the defendant); *United States v. De La Fuente*, 353 F.3d 766, 768; 774 (9th Cir. 2003) (affirming a restitution order compensating the United States Postal Service for employee work hours lost due to an anthrax hoax); *see also Kelly v. United States*, 140 S. Ct. 1565, 1573-74 (2020) (explaining that "the cost of [city] employees' services would qualify as an economic loss to a city" in the context of a fraud scheme and noting that the loss of municipal employee services is akin to taking "cash out of the city's bank account" and "depriving the city of a 'valuable entitlement'" (citing *Pasquantino v. United States*, 544 U.S. 349, 357 (2005)).

While it is clear that the government can receive restitution when it suffers a loss resulting from the defendant's conduct, it is equally clear that the government may not recover costs associated with a criminal investigation. *Phillips*, 367 F.3d at 863 (holding that there is a "dividing line between criminal investigation costs (which are not recoverable) and other investigation costs (which may be recoverable)"). In *Phillips*, the defendant violated the Clean Water Act by unlawfully polluting a navigable river under the jurisdiction of the EPA. *Id.* at 850-51. In considering whether the EPA could receive restitution for the costs of assessing the damage caused by the defendant's crimes, the Ninth Circuit concluded that the EPA's site investigation costs were "likely not a routine matter in all such criminal cases . . . [but were a] direct result of the *offense*, not . . . a direct result of the criminal prosecution. *Id.* (citations omitted). In such situations, the court held, "investigation costs are a . . . subset of cleanup costs and recoverable to the same extent." *Id.*

---

[5] The Victim Witness Protection Act (VWPA) preceded the MVRA as the controlling federal restitution statute. The Ninth Circuit has held that, because of the similarities between the MVRA and its predecessor, courts may look to cases decided under the VWPA for guidance in interpreting the MVRA. *United States v. Brock-Davis*, 504 F.3d 991, 996 (9th Cir. 2007) (citing *United States v. Gordon*, 393 F.3d 1044, 1048 (9th Cir.2004); *United States v. Grice*, 319 F.3d 1174, 1177 (9th Cir.2003)).

Judge Chhabria recently applied these principals in *Schurman*. In that case, the defendant defrauded his property-owning clients by peddling fake engineering inspection reports (known as "special inspection reports") falsely certifying that an engineer had reviewed components of the clients' construction and renovation projects. *Schurman*, No. 21-CR-00234-VC-1 at *1. In fact, unbeknownst to Schurman's clients, no inspections ever occurred and *Schurman* falsified the reports by making up the results and forging the engineers' signatures. *Id.* Schurman's clients submitted the fake reports to DBI, which relied on them in issuing final approvals and CFC's. *Id.* DBI Director O'Riordan submitted a letter to the court explaining that Schurman's fraud necessitated re-inspection of the affected properties. *Id.* at ECF No. 67, Gov. Memo Re: Restitution at *1-5. Director O'Riordan's letter also calculated DBI's losses using the statutory hourly rate set forth in the San Francisco Building Code (the same section of the code used to calculate DBI's losses in this case). *See Id.* In awarding restitution to DBI, the court found that DBI's re-inspection of the affected properties was not routine nor intended to further the government's criminal investigation of Schurman. *Id.* at *6. The court held that "where an offense covered by the MVRA is the direct and proximate cause of non-prosecution work that would otherwise be unnecessary, restitution is both authorized and required." *Id.*

Taken together, the cases show that investigative costs that are ordinarily incurred in the usual course of investigating and prosecuting crimes are not recoverable under the MVRA. On the other hand, where the government incurs non-prosecution costs to investigate and remediate harm caused by the defendant's offenses, the government can and must be awarded restitution. Here DBI's losses were the direct and proximate result of Santos' and Curran's criminal conduct and would not have been incurred but for their illegal scheme. Indeed, Santos facilitated $9,600 in donations to Curran's favorite charity "intending that those donations would influence Curran in the performance of his official duties" as a DBI Senior Building Inspector. (Plea Agreement ¶ 2.) In exchange for the donations, Curran gave Santos' clients favorable treatment. (*Id.*) In the case of the property located on the 1400 Block of Church Street, discussed above, Curran granted final inspection approval and issued a CFC even though the owner of the property – a Santos client who made an SFGGRA donation – had not installed a required fire safety system. (*Id.*) Faced with this evidence, DBI was compelled to initiate the audit.

13

1    According to DBI, the purpose of the audit is to ensure that the affected properties are safe and in
2 compliance with building codes, not to develop evidence to further the investigation or prosecution of
3 Curran.  DBI-VIS at 2 ("The Audit is not a project ordinarily undertaken by DBI staff in their normal
4 course of responsibilities and was only made necessary by the illegal acts of Santos and Curran.").
5    For the foregoing reasons, DBI's restitution request falls squarely within the category of
6 compensable investigative and remediation costs.  The Court should find that DBI's losses were the
7 direct and foreseeable result of the defendant's wrongful conduct and order restitution accordingly.

**VII.    FORFEITURE**

   The defendant in this case agreed to pay both restitution and forfeiture.  (*See* ECF No. 15 ¶¶ 9, 11.)  To date, the defendant has paid $150,000 into the Court's registry to satisfy his anticipated restitution obligation.  (*See* ECF Nos. 22, 26.)  The government notes here that although this payment reduces the defendant's restitution obligation, it does not affect the value of property subject to forfeiture.  Preliminarily, both forfeiture and restitution are mandatory aspects of a defendant's sentence. *United States v. Rivera*, 686 F. App'x. 470, 472 (9th Cir. 2017) (citing *United States v. Hunter*, 618 F.3d 1062, 1064 (9th Cir. 2010)); *United States v. Newman*, 659 F.3d 1235, 1240 (9th Cir. 2011), *abrogated on other grounds*.  Forfeiture and restitution are separate, albeit complementary, remedies available to the government at sentencing.  Restitution serves to make a victim whole, while forfeiture is punitive. *United States v. Davis*, 706 F.3d 1081, 1083 (9th Cir. 2013) (citing *Newman*, 659 F.3d at 1241).  To that end, the Ninth Circuit has held that there is no basis to offset one against the other in cases where both must be ordered—they are both collectable in full, whether the victim is a private person or a governmental entity. *Id*. at 1084.

   Although a Court must order both restitution and forfeiture where both are applicable, Congress has provided the government a path to apply funds obtained as part of a forfeiture judgment to a restitution judgment, but there is no requirement that it do so.  *See* 18 U.S.C. § 982(b)(1) (incorporating 21 U.S.C. § 853(i)).  Victims seeking remission or restoration of forfeited assets must apply to the appropriate governmental agency for relief, and victims (and the government) are required to attest to certain facts for relief to be granted.  *See* 28 C.F.R. § 9.8.  But before restoration relief may be granted, a

14

Court must issue a restitution order. The reason the order is required is so that the government may transfer assets to the Clerk of Court, who then dispenses restitution benefits to victims and accounts for the payments in the Court's registry. To that end, forfeiture and restitution work together to ensure that a defendant does not keep the ill-earned gains of their crimes, while victims are made whole.

## VIII. CONCLUSION

For the foregoing reasons, the government respectfully requests that the Court sentence the defendant to a term of 51 months in prison to be followed by three years of supervised release, and order the defendant to pay full restitution to the fraud victims, the IRS, and DBI. Consistent with the plea agreement, the Court should also enter a forfeiture money judgment in the amount of $1,495,296.24.

DATED: August 18, 2023

Respectfully Submitted,

ISMAIL J. RAMSEY
United States Attorney

_/s/_
CASEY BOOME
Assistant United States Attorney